May it please the court, my name is Katherine Clark and I am appearing on behalf of the United States Attorney General. Hold the mic up a little bit closer please. Tahir Murillo's petition for review should be dismissed because the agency made two discretionary determinations that are beyond the court's review in this case. It concluded that Tahir Murillo's conviction for unlawful sexual intercourse with a minor was a dangerous crime and it concluded that his mother would not suffer exceptional and extremely unusual hardship if he were removed. Tahir Murillo has failed to confer jurisdiction on the court under 8 U.S.C. section 1252 A.2.D. by raising a genuine question of law or a constitutional claim. Furthermore, even if the court were to review the agency's determination that Tahir Murillo's crime was dangerous, this determination was proper. The court lacks jurisdiction to review the agency's decision that Tahir Murillo's crime was dangerous and therefore that the agency should apply the heightened standard of hardship found in 8 C. of V.A.R. section 1212.7.D. 8 U.S.C. section 1252 A.2.C. bars review of removal orders against aliens who are removable because they have been convicted of crimes involving moral turpitude. Tahir Murillo does not contest on appeal to this court that he is removable for having been convicted of a crime involving moral turpitude. 8 U.S.C. section 1252 A.2.B.I. bars review of challenges to discretionary determinations relevant to applications for waivers under 8 U.S.C. section 1182.H. In Tahir v. Gonzalez, the court specifically held that 8 C. of V.A.R. section 1212.7.D. speaks only to the exercise of discretion under section 212.H of the I.N.A., not to the threshold determination of eligibility for adjustment of status or for a waiver under section 212.H.1. Assume for the question I'm about to ask that we do have jurisdiction. We're not conceding it. It's an assumption type question. But assume that we do have that jurisdiction. What analysis did the I.J. undertake on the hardship question? The I.J. found that Tahir Murillo What was the analysis? My understanding is that the petitioner put on evidence about his mother's illness or medical situation, the psychological impact of being separated, that sort of thing. What analysis did the I.J. undertake? The I.J. analyzed whether that hardship evidence showed that Tahir Murillo's mother would experience hardship over and above that normally associated with removal or deportation from the United States. And I've read the transcript. The only thing I could find was his statement that 160 of the A.R. where he says, quote, before having examined all the evidence, documentary evidence submitted to it, as well as the testimony of the respondent and the respondent's mother, the respondent has not met its burden of showing exceptional and extremely unusual hardship. Is there anything else in the transcript or the I.J. address page? On the 15th page of the immigration judge's decision, the language that I quoted appears. It says it is not hardship over and above that normally associated with the removal or deportation from the United States. Is there any place in the transcript that we could look to that would reflect on the I.J.'s, immigration judge's analysis of the issue other than conclusory statements? In the immigration judge's recitation of the facts, the immigration judge discusses Tahir Murillo's mother's claims that she was suffering from depression. And also from her also regarding her health problems, such as asthma, I just wanted to find the page in the record that's on my council table. Sure. Thank you. On page 51 of the administrative record, and as well on page 53. Okay. So she had clinical depression. Did the record also indicate that she had suicidal thoughts if her son left? The record indicated that she did not intend to harm herself. Her medication was increased, and she testified that she was able to tell her doctor that she would not harm herself. She had to say that life would have no purpose if she left. She's on asthma medication. She's on some other forms of medical care, right? What were in the record in the analysis? Does that indicate that these are normal problems associated with removal? Those statements about her medical history are in the record. But the I.J. made the conclusion that these are just normal things that occurred. Correct. Where in the record is that statement supported? The statement, the conclusion that it is inferred that, first of all, that would be a discretionary determination. The exceptional and extremely unusual hardship would, in any case, be a discretionary determination that is not subject to review. Let me ask you the question while I ask it. Where in the record is it supported that the conclusion that this is just a normal type of reaction that occurs in these types of circumstances is supported? I believe that the language that the immigration judge is using is intended to invoke the BIA standard in the matter of Mona L. And in doing so, that case dealt with factors such as age and health and issues that do come up directly in this case. And I believe that that language was most likely intended to invoke a comparison between the case, the instance of Tahi Mora's mother's evidence and the evidence in hardship cases before the BIA where that had been established. Actually, I was asking as where is it in this record that the I.J. either conducted that analysis or made the factual finding that based on other cases that this was normal? That would be a connection between the findings that FACT made and the holding regarding. The fact is, though, I understand your argument that you're comparing the cases, but the I.J. didn't make that determination in this case in his analysis, nor did the I.J. say I've seen a lot of cases and this is a normal reaction, nor did there was no evidence to the record that this is normal. So we just have to take that absence of finding and compare it with the case law, if we're going to agree with you. The immigration judge is not obligated to cite particular case law for that sort of determination. In any case, that would be a discretionary determination. The hardship determination is not a question of law, nor is it a constitutional question. That's under this court's holding in Romero-Torres. Do you believe it's an unfettered discretion that even if there were extreme hardship shown, that the I.J. has completely unfettered discretion to make an arbitrary rule in instances like this? That seems to be where your argument is headed. The court need not reach that question in any case, because this was not a completely arbitrary determination, given the connection between the facts in this case and the facts in prior. I know we don't, but is that your legal position, that the I.J. has completely unfettered discretion to deny belief, even for a silly reason? An arbitrary reason, a reason not supported at all in the record? The immigration judge's reasons for reaching a hardship determination are not subject to the court's review, because they are a discretionary judgment. Even if it's arbitrary, capricious, and perhaps completely wrong, right? That's your position. The correctness or wrongness of the immigration judge's decision is not subject to the court's review. That's under the court's precedent again in Romero-Torres. Could it be based on the petitioner's religion? That is simply not an issue in this case. I understand that. And I would not wish to. We understand that. Well, I'm probing the position of the government, which is speaking for the United States government here, and Judge Thomas asked you a question that's in my mind also, and that's whether this discretion is completely unfettered. So, with that understanding, could an immigration judge reach a decision based on the petitioner's religious beliefs? I would not wish to speculate or state such a position in a case where it doesn't come up. So the discretion, in your opinion, is not completely unfettered. There are some restraints on it. If the petitioner is a question of law or a constitutional claim, the court could review that. That's not the question. You say that we can't explore the exercise of discretion, and the question is whether that discretion is completely unfettered, untethered to any reason at all, including no reason at all. The immigration judge says, I just don't like you. The standards in our meritorious are the standards that apply here. I would not wish to speculate on facts that are simply not before us in this case. Okay. Thank you for your argument. I wanted to state for the record, you can sit down, that the panel received a letter from counsel for petitioner, counsel Leticia Moreno, and the panel entered an order denying her request to submit the case. And I wanted to state for the record that that had nothing to do with the health concerns that she raised. It was simply a matter of time and counsel for the government was on the way, and there simply wasn't enough time to deal with that. And the letter included a request to withdraw as counsel, and that will have to be dealt with at a later time. But I guess we would say that the failure to appear here today is at least understandable, if not excused. Thank you for coming in, counsel. The case just argued will be submitted for decision. We'll proceed to the next case on the calendar, which is Xiong v. Mukasey. Counsel will come forward. Mr. Polk. Good morning, Your Honors. Good morning. I'm John Polk, the attorney for the petitioner. Speak right up.  Speak right up. Thank you, Your Honor. Your Honor, the petitioner believes that the BIA abused its discretion when it vacated the grant of withholding a removal, finding that both the country conditions in Laos had changed significantly and that the respondent had failed to show that it's more likely than not that he would be harmed or persecuted if he was returned to a country of Laos. The government argues that this court lacks jurisdiction to hear these arguments. And we would point the court to the case of Yuna Waka Hauua. And I'm sorry if I pronounced that wrong. 461-539-31, where the Ninth Circuit has said that the BIA does not order a petitioner removed based upon his aggravated felony and does not predicate its decision denying withholding a removal and refund a cat on petitioner's aggravated felony or discretionary decision. We have jurisdiction to review this. It has also been followed by more recent cases, such as Morales v. Gonzales and Artiega. And the government wants to argue Artiega v. McCasey, which I think can be distinguished because really Artiega is a case that, well, it says that jurisdiction is only relevant where there are constitutional questions or questions of law being raised. I believe in this case we are raising significant questions of law. Those questions revolve around two matters. Whether or not the respondent was entitled to withholding a removal based upon the fact that, first, he was a refugee. In 1995, the government of the United States awarded him refugee status and asylum and allowed him to come to the United States. In 2001, he was afforded lawful permanent residence as a refugee. He then committed a crime for which we make no reference as to its seriousness or not. The crime is an aggravated felony, and he applied for cancellation. Pardon me. He applied for asylum, withholding, and relief under the Convention Against Torture. The I.J., who was the ultimate trial of fact in this issue, found in his analysis that, A, the petitioner's father did fight for the United States. He was a member of the non-secret army and was credited with at least serving two United States pilots. You're just fundamentally here on the withholding issue, aren't you? Yes, sir. You waived cap at the I.J. stage? We did, Your Honor, because he granted withholding. And it appeared that the burden that the petitioner would have to carry would not be able to be met based upon an imputed torture. He had never actually lived. He had been born in Thailand and had not ever lived in Laos. But the withholding claim… He was born in a refugee camp, wasn't he? He was, sir. And he lived in that refugee camp where the father lived there for 21 years. So the I.J. in the original proceedings stated, upon examining all the evidence before that the respondent has met the burden of withholding, that is showing that there is a clear probability of persecution in Laos if the respondent is removed there. Based upon his race, that being Hmong, based upon the imputed political opinion to his father, and based upon the fact that his father had participated in the war on the side of the United States as one of the secret guerrilla units, that evidence is adequately in the record where he has received awards and certificates from the Laotian Veterans Association, which identify his role. I believe that the BIA misstated the facts when they said he did not fight in the war. The A.R. actually provides other evidence. If you refer to A.R. page 170 and the exhibits in A.R. 372, both point to the fact that Petitioner's father did, in fact, fight in the war. He commanded a unit of people. In his own testimony, he claimed that a number of the people who worked for him or who were subordinate to him were killed in the fighting. I think that the BIA erred in making a finding of fact. I also believe that the BIA erred when they found that there was significant evidence in the record to justify changed country conditions. The only evidence in the record is the country report from 2004. And the country report from 2004, on its first page, this would be A.R. 378, the lead sentence of the fourth paragraph says that government's human rights record remained poor and it continued to commit serious abuses. The Petitioner would agree with that statement. The government contends that since 20,000 people were repatriated, that there is no longer a danger. The Petitioner would submit that over 200,000 people left that country and never returned. And that would fly in the face of that argument. There are lots of reasons not to return to Laos other than fear of what might happen when you get back. You may like it where you've gotten to better. Well, I'm not sure a Thai refugee camp would qualify for that, though, sir. But I understand the court's point. I don't know if you're familiar with the decision of our court from 1998 called Vang versus INS. I don't think it was cited in either brief, but it turns out that at least one occasion we dealt with somewhat similar situations. Let me just go ahead and read the relevant portion of that, because ultimately it troubles me in trying to see how we could say that the result you advocate is compelled, but a reasonable fact finder couldn't conclude otherwise, given that in an opinion authored by Judge Dorothy Nelson, we said something like this. Vang's argument that he is more likely than not to face persecution should he be deported to Laos is not convincing. None of Vang's family has been in Laos nearly 20 years. Vang has provided no evidence suggesting he would be recognized as an enemy by the Laotian government. Moreover, the State Department has reported the successful repatriation of thousands of ethnic Hmong to Laos. In fact, the only Laos citizens who have faced problems upon repatriation have been individuals who held high positions in the pre-1975 government, who have close ties to General Vang Phao, or who are involved in the current consergency. Because Vang fits into none of the above categories, the decision not to withhold deportation is supported by substantial evidence. Why is your case different? Your Honor, if you would refer to the record, there is a letter in the record from General Vang Phao, who states that the petitioner's father worked for him, directly for him, and carried out his orders. The communist government of Laos has a long memory, especially for the Hmong people who assisted the CIA and the United States forces in Laos. Your Honor, I would ask to be permitted to use my remaining two minutes for a rebuttal. Fine. Thank you, counsel. Thank you, Your Honor. The Attorney General at this time, counsel. Ms. Clark. Good morning, Your Honor. My name is Nicole Murley. I've got a cold side. Is Ms. Murley around? Ms. Murley. No worries. I represent the Attorney General in this matter. This is a criminal alien case where the alien was found removable for his conviction for attempted unlawful sexual intercourse with a minor, which is an aggravated felony under the INA. Because petitioner was ordered removed for his aggravated felony and is failed to raise a question of law before this court, Section 1252A2C does apply to this case, the criminal alien review bar, and this court's precedent bars this court from reviewing petitioner's claims. The first thing in response to petitioner's counsel's argument, the standard of review for the board's decision is not, in this case, abuse of discretion. It would be the substantial evidence standard, and whether any reasonable adjudicator would be compelled to conclude to the contrary of the board's decision regarding petitioner's withholding of removal claim. The second point I would like to address is that petitioner argues that Una Akalu is controlling in this case. It is the government's position that Ruiz-Morales, the decision Ruiz-Morales is controlling in this case, where the court's later decision in Morales actually states that there is no inconsistency between the court's holding and Ruiz-Morales and Una Akalu. And in Ruiz-Morales, the petitioner was found removable on one ground, and one ground only, and it was an aggravated felony conviction. In Una Akalu, the court held that there were two grounds for removability in the removal order, and it couldn't tell whether or not the petitioner was explicitly being removed on the aggravated felony ground. Therefore, the 1252A2C bar, you couldn't tell whether or not that should be employed. I'm looking at what appears to be the BIA, the board's ruling. It's pages two and three of the AR. Yes. It's exactly two pages long. Yes. And from my reading, the only portion of that that deals at all with withholding of removal is the very last paragraph. Is that right? There's the previous order from the Board of Immigration Appeals. I believe it's on 80 to 83 of the record that actually deals with the withholding of removal claim. 80 to 83? Yes, 80 to 83. It's the February 13, 2006 order. Now, is petitioner counsel correct in saying that the BIA asserted there that petitioner's father was not in the military, did not participate in helping American forces in that theater? No, Your Honor. The board, based on the record evidence, noted that petitioner's father testified that he never directly engaged in fighting. The board then goes on to say within the same sentence that petitioner's father did testify that he did, at one point, help two downed American pilots. So the board didn't – it wasn't – the board wasn't making a finding of fact. It was noting what petitioner's father's testimony stated. Petitioner's father said that he did – he was a leader in his village and sort of commanded the fighting, but never directly engaged in fighting himself. We don't know from looking at the board's decision who the members of the board were. Okay. Or whether they were possessed of particularly unique military experience. Do you think, as a lawyer for the government, that during the Vietnam War, a downed American pilot shot down by enemy forces, that those trying to rescue the pilot on behalf or at the behest of the CIA and return the pilot back to American lines, that that doesn't constitute combat? Your Honor, I hesitate to – I don't have military experience myself. By any stretch of the imagination, would that be construed to not be engaged in combat? I think that the – it could be, yes, that there's a difference. I think the board was pointing out to petitioner's claim of whether or not how actively engaged in 1975 petitioner's father was, and whether or not that you would be able to, 20 years later, make a link from petitioner's father to petitioner. I don't think that the board was making concrete military assessments, so much as was looking at the record evidence and trying to determine whether or not petitioner had in fact met his burden, for more likely than not. But was – testimony wasn't there on the petitioner's side that two of his friends had returned to Los and had similar connections and disappeared? Petitioner's – Yes, isn't it? Yes, it was petitioner's uncle, and it's unclear whether they had similar ties in terms of family members who had fought or had participated within the Vietnam War. I think that the board was pointing out to petitioner's claim of whether or not petitioner's father had met his burden, and whether or not petitioner's father had disappeared.   or not petitioner's father had met his burden.  Individuals of Laotian descent, particularly belonging to the Hmong tribe, when they return to Laos, have to register with an embassy or something like that? There was, I believe in the State Department report, there was evidence, or it does state that when Laotians of Hmong descent go back, they do have to identify ethnicity, they have to register with the government. But in terms of repatriating back, I believe that all the citizens would have to be in some contact with the Laotian government. That was my understanding of the State Department country reports. Focus on that stage, because it seems to me the main thrust of the board's determination was that they wouldn't connect the petitioner here with his family. They didn't dispute really that his father had done activities on behalf of the United States, but they figured there's no reason the Laotian government today would connect up petitioner. And yet petitioners never set foot in Laos in his life. And it seems to me, given that you don't cross borders and enter countries easily, separate and apart from the particular requirements that you refer to from the country report, how is it this person would not come to the government's attention? Wouldn't you think they'd be at least a little curious to why this person who has never been in Laos before and spent the last 10 or 15 years in the United States suddenly appears on their doorstep? Doesn't that kind of cry out for, gee, who is this guy? What's his background? Who is he related to? Well, first, it's petitioner's burden before both the immigration judge and the board to establish that it's more likely than not that his life or freedom is threatened upon return. And the evidence, the record evidence in the State Department country reports say that there was 20,000 to 30,000 that returned under the United Nations High Refugee Commission. And petitioner testified that while he was in the Thai refugee camp, he knew of other relations of similar descent who had returned voluntarily to Laos. So whether the government knows where he came from, there is no record evidence to suggest or indicate that that would lead petitioner to a more likely than not that his life or freedom would be threatened. It's likely to put this guy in a plane. He's going to show up at the airport. He's not coming back under the auspices of the U.N. from a refugee camp. He's coming in on a flight from wherever they fly from. And I can't help but think that it's more likely than not that the Laotian government will see, well, what is it they're trying to give to us here? Who is this guy? He's not going to be caught in a crowd someplace. Inherently, the situation seems to cry out that he's going to be looked at somewhat more carefully than the crowd coming back across the border from a refugee camp. And again, petitioners not put forth any record or any evidence in the record that would suggest that there would be red flags raised by the Laotian government. It is, as I pointed out, his burden to establish. Well, he put on evidence that people would come back who were in similar situations and disappeared. He produced some documentary evidence. And what the government has shown in this case is simply a generic catch report that says that people have come back. One of our requirements is that the catch reports to be persuasive have to be individualized to the claim. And in this case, the claim is that he's going to be discriminated against and persecuted because of his affiliation with his father and the efforts to help the Americans. Now, all the catch reports talk about are this particular subgroup of this population coming back. There's nothing in the catch reports I saw, and you can correct me if I'm wrong, that would indicate that people who assisted the Americans who are coming back are treated well. Correct? Correct. But there is also not in the record evidence anything to suggest that people who assisted the Americans suffer threatened. That it's more likely than not that their right for freedom will be threatened upon return to Laos. It's simply not in the record. And the standard of a substantial evidence review is that any reasonable adjudicator must be compelled. It is not sufficient that you could draw two inconsistent conclusions from the same set of facts. But in order to support the BIA's conclusion that the Laotian government is not going to connect this person, that's simply speculation, isn't it? It's not. The board was looking at the record evidence to determine whether or not Petitioner meddles burden in. . . But they're just speculating, right? There's nothing in the record that would indicate that, is there? There's no record evidence. There's no record evidence to say that the Laotian government would not connect him, but as a point of . . . there's no record evidence to suggest that they would. We have somebody who's taken on a plan from the United States. He's taken into the country. All of these proceedings are a public record in the United States. They know why he applied for relief here, right? They can? Yes, they can. These are public records. He's being deported from the United States. He's taken to the border. He has to register as a Hmong, returning. And his records of the United States are available. Is there any reason to believe that the Laotian government would not connect him? I don't think it's reasonable to conclude that they would connect him based on the record evidence. And if I may answer, even though I'm out of time, as this plaintiff pointed out, this court has . . . there's a case where there was nothing to connect the petitioner to his family in Laos. There's simply nothing in the country reports in 2004 that show that people of Hmong descent who participated in the Vietnam War are subject to some sort of higher scrutiny by the government upon return to Laos. And if I may conclude that it's petitioner's burden to prove that the record evidence would compel a different conclusion. And it's not sufficient that you could look at the record evidence and draw two different conclusions. You must compel it, Elias Zacharias. Thank you for your argument, Counsel. Counsel? Yes, Your Honor. Thank you. Your Honor, the petitioner would submit to the court, as pointed out, that the government was required to conduct an individualized assessment of the changed country conditions as they relate to the country of Laos in looking at this refugee who was requesting withholding of removal. I would also point out to the court that the record does reflect two points. One is that over 100,000 Hmong were killed in the fight in 1975, and it was the Hmong. These were people who were singled out by the Laotian government because of their assistance to the United States government. And I would also point out, and one of the points that the record has spoken to, in the country report, the passages that were referred to by the BIA where they talk about 20,000 people being repatriated and that the country conditions had changed, they left out the last two sentences of that paragraph that relate to the fact that returning returnees get special marks on their passports. And this has led to an assumption or a belief by most of the returnees that this is an easy way to single out people for retribution. It's a marking of a passport. We've seen it before. Thank you, Your Honor. That's all I have. Thank you, counsel. Thank both sides for their argument. The case just argued will be submitted for decision.
judges: Hawkins, Thomas, Clifton